UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
ADVOCATES FOR HIGHWAY AND        )
AUTO SAFETY,                     )
                                )
          Plaintiff,            )
                                )
     v.                          )      Civil Action No. 98-306 (RWR)
                                )
FEDERAL HIGHWAY                  )
ADMINISTRATION, DEPARTMENT OF    )
TRANSPORTATION,                  )
                                )
          Defendant.            )
_____ )

### MEMORANDUM OPINION

Plaintiff Advocates for Highway and Auto Safety ("AHAS"), a public interest, safety research, and lobbying organization, challenges the decision of defendant Federal Highway Administration ("FHWA"), a modal administration of the United States Department of Transportation ("DOT"), to withhold access to videotapes requested under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  The parties have filed cross-motions for summary judgment.  Because the factual record is insufficient to find that either side is entitled to judgment as a matter of law, both motions will be denied.

### BACKGROUND

In 1989, FHWA initiated "The Commercial Motor Vehicle Driver Fatigue and Alertness Study" ("the study") to observe and measure the development of fatigue by Commercial Motor Vehicle ("CMV")

- 2 -

drivers under authentic road conditions. (Def.'s Mem. of P. & A.
Supp. Mot. Summ. J. ("Def.'s Mem.") at 2.)  The purposes of the
study were to research CMV driver fatigue and to inform a review
of FHWA's regulations on hours of service for CMV drivers.
(Def.'s Mem. at 2; Def.'s Reply Mem. Supp. Summ. J. ("Def.'s
Reply") at 3.)

      As a part of the study, video cameras were mounted in the
trucks of certain qualified CMV drivers. (Def.'s Mot. Summ. J.
("Def.'s Mot."), Decl. of Paul L. Brennan ("Brennan Decl.") ¶ 5.)
These cameras simultaneously recorded the driver's face and the
road extending out before him, with the results captured on
videotape in a split-screen format. (Id.)  The study collected
over 4,000 hours of such "driver face" information. (Id. ¶ 8.)
Several of the videotapes revealed drowsy drivers, some of whom
appeared to be drifting off the road. (Id. ¶ 14.)  However, no
accidents occurred during the study. (Id.)

      The subjects of the study were eighty male CMV drivers
employed by three motor carriers. (Id. ¶ 3.)  Every subject
signed a form which read:

            Each driver's results will be used only for
            the scientific goals of this research.  Your
            name will not be used.  Your results will be
            identified in the data base [sic] by a code
            number to maintain your privacy.

(Id.)  The tapes contain no information personally identifying
the drivers other than the images of their faces. (Id. ¶ 8.)  It

- 3 -

is impossible, for purposes of AHAS's FOIA request, to redact the
identifying features of the subject drivers because the
informational value of the videotapes lies in the appearance of
these features.  (Id. ¶ 14.)

The study ran from 1989 to 1996.  (Pl.'s Mot. Summ. J.
("Pl.'s Mot."), Pl.'s Statement of Facts ("Pl.'s Facts") ¶ 1;
Def.'s Opp. to Pl.'s Mot. Summ. J., Def.'s Resp. to Pl.'s
Statement of Facts ("Def.'s Resp. Facts") ¶ 1.)  The Essex
Corporation of Goleta, California collected the videotape data in
1993 under a contract with FHWA.  (Id.)  The study cost an
estimated $4.5 million.  (Pl.'s Mem. of P. & A. Supp. Mot.
Summ. J. ("Pl.'s Mem.") at 5; Def.'s Mem. at 2.)

AHAS filed a FOIA request for access to 199 hours of driver
face videotapes.  (Pl.'s Facts ¶ 10; Def.'s Mot., Def.'s
Statement of Facts ("Def.'s Facts") ¶ 1.)  FHWA denied the
request, citing FOIA Exemption 6 and stating that release of the
information would constitute an invasion of the privacy of the
drivers who participated in the study.  (Pl.'s Facts ¶ 10; Def.'s
Facts ¶ 2.)  AHAS appealed FHWA's decision through the
appropriate DOT administrative procedures.[1]  (Def.'s Facts ¶ 3).

_____

[1] AHAS filed a second FOIA request, this time seeking access
to the entire database collected for the study.  (Pl.'s Facts ¶
10; Def.'s Facts ¶ 4.)  FHWA responded by making copies of all

- 4 -

FHWA denied AHAS's administrative appeal.  (Def.'s Facts ¶ 7.)

AHAS filed this action, and both sides have moved for summary

judgment.

<u>DISCUSSION</u>

Summary judgment is appropriate where the record shows that

"there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  A party seeking summary judgment must provide the

district court with a factual record sufficient to demonstrate

the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The moving party

may support its motion successfully if it "'inform[s] the

district court of the basis for its motion, and identif[ies]

those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of

a genuine issue of material fact.'"  <u>Frito-Lay, Inc. v.</u>

<u>Willoughby</u>, 863 F.2d 1029, 1032 (D.C. Cir. 1988) (citing <u>Celotex</u>,

────────────────────

requested records available to AHAS other than those which relate
to the driver face videos.  (Pl.'s Facts ¶ 12; Def.'s Facts ¶¶ 5-
6.)
        AHAS originally asserted that this second request was at
issue in this case.  Both parties now agree that there is no
dispute regarding any non-videotape material.  (Pl.'s Reply to
Def.'s Mem. P. & A. Opp'n Pl.'s Mot. Summ. J. and in Further
Supp. Pl.'s Mot. Summ. J. at 8.)  Accordingly, this opinion is
limited to the 199 hours of videotape which constitute AHAS's
initial request.

477 U.S. at 323).  In this case involving cross-motions for summary judgment, the inquiry is whether either party, as a movant, has provided sufficient evidence that no factual dispute exists concerning the application of FOIA Exemption 6 to the videotapes requested by AHAS.

FOIA facilitates open access to federal government documents by members of the public.  Dep't of Air Force v. Rose, 425 U.S. 352, 360-61 (1976); see also U.S. Dep't of Defense v. Fed. Labor Relations Bd., 510 U.S. 487, 494 (1994).  It is "basic policy that disclosure, not secrecy, is the dominant objective" of FOIA. Rose, 425 U.S. at 361.  Full disclosure serves crucial twin objectives: to ensure an informed public and to subject government activity to "the critical lens of public scrutiny." Alliance for the Wild Rockies v. Dep't of the Interior, 53 F. Supp. 2d 32, 35 (D.D.C. 1999); Southern Utah Wilderness Alliance, Inc. v. Hodel, 680 F. Supp. 37, 39 (D.D.C. 1998).

Congress recognized, however, that not all government information should be made available for disclosure under FOIA. Alliance for the Wild Rockies, 53 F. Supp. 2d at 35. Specifically, FOIA Exemption 6 permits a government agency, such as FHWA, to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). The primary purpose of Exemption 6 is "to protect individuals

- 6 -

from the injury and embarrassment that can result from the unnecessary disclosure of personal information." United States Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982). Because FOIA's central purpose is to ensure public scrutiny of government activities, and not information about private citizens that "happens to be in the warehouse of the Government," the government need not honor a request for information about a particular private citizen. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 774-75 (1989).

Both parties agree that the videos at issue are "similar files" within the meaning of Exemption 6. Consequently, the issue is whether release of the videos would "constitute a clearly unwarranted invasion of personal privacy." Such a determination is made by "weigh[ing] the privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999) (citation omitted).

I.   PUBLIC INTEREST

"The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency's performance of its

statutory duties or otherwise let citizens know what their government is up to." <u>Lepelletier</u>, 164 F.3d at 46 (citing <u>United States Dep't of Defense v. FLRA</u>, 510 U.S. 487, 497 (1994)) (internal quotations omitted).  AHAS argues that a strong public interest exists in the release of the videotapes because (1) the videos will serve as the basis for government regulations; (2) the cost and size of the study warrant public oversight; and (3) independent review of the study's results indicates problems with the study's methodology.  FHWA argues that a minimal public interest exists in release because (1) the videos contain information about the conduct of the drivers, and not of FHWA; (2) any benefit to the public is purely speculative; and (3) any existing questions about methodology would not be served by releasing the videos.

AHAS's public interest analysis remains viable despite the passage of some time since the conclusion of the study and the initiation of the instant action.  The study retains importance in the field and has informed successive DOT rulemakings on hours of service of drivers.  <u>See</u> Final Rule, Hours of Service of Drivers, 73 Fed. Reg. 69567-02, 69575 (November 19, 2008) (stating "the Driver Fatigue and Alertness Study (DFAS) (Wylie et al., 1996) was the first to identify the impact of circadian rhythm on CMV driver alertness, and almost every fatigue study after the DFAS has used those results or found similar results,

- 8 -

to the point that the impact of circadian rhythm on driver

performance is now a generally accepted principle"). DFAS was "a

landmark study of driver fatigue" and "was particularly important

in changing the methodology by which commercial driver research

would be conducted in the future, introducing the use of

instrumented vehicles and technology for collecting data in a

field setting." Id.; see also Notice of proposed rulemaking, 75

Fed. Reg. 82170-01, 82173 (December 29, 2010) (reviewing history

of CMV hours of service regulations and noting study's completion

as part of turn to new "science-based" rules).

Releasing the videotapes will reveal information about the

conduct of FHWA, a government agency. When an agency relies on

information in formulating a rule, there is a strong public

interest in disclosing the underlying information, even if it

relates to particular individuals. Alliance for the Wild

Rockies, 53 F. Supp. 2d at 37. In Alliance for the Wild Rockies,

members of the public submitted comments to the Fish and Wildlife

Service ("FWS") which served, in part, as the basis for FWS's

rules relating to the conservation and survival of endangered

grizzly bears. Id. at 32-36. Full disclosure of the comments,

including the names and addresses of the contributors, was

warranted because FWS relied upon them in formulating its

regulations. Id. at 37. In this case, FHWA admitted that it

would rely upon the videotapes in promulgating rules on driver

hours of service, though only to a limited degree.  FHWA likened
the videotapes to a single tree in the forest of information upon
which the final rules would be based.  (Def.'s Reply at 3.)
However, since the videos ostensibly played a role in forming the
rules, the public has an interest in observing every leaf of
every tree in the forest of data upon which a public agency has
relied in issuing rules that bind the public's conduct.
Releasing the videos will cast light on FHWA's rulemaking
process.

     Moreover, releasing the videotapes will reveal information
as to government expenditures on a project of substantial scale
and expense.  When information sheds light on the inner workings
of a government agency, there is a public interest in its
release.  <u>Washington Post Co. v. United States Dep't of Agric.</u>,
943 F. Supp. 31, 36 (D.D.C. 1996).  Records that pertain to
particular individuals may still be "cloaked with the public
interest" and subject to disclosure if the information would shed
light on agency action.  <u>The Nation Magazine, Washington Bureau
v. United States Customs Serv.</u>, 71 F.3d 885, 894-95 (D.C. Cir.
1995).  In <u>Washington Post Co. v. Dep't of Agric.</u>, 943 F. Supp.
at 36, the release of the names and addresses of individuals
receiving cotton price support payments was warranted by the
great public interest in overseeing the workings of the
Department of Agriculture and its subsidy programs.  Here, the

videos were gathered as part of a study which spanned seven years and cost $4.5 million.  The public has an interest in seeing how and why taxpayers' money was spent.  Such an interest is not merely speculative.

Finally, some controversy arose as to the methodology FHWA used in processing the data contained on the driver videotapes. Allegations of distortion and misrepresentation of data by government agencies heighten the public's interest in release of that data.  Lurie v. Dep't of the Army, 970 F. Supp. 19, 39 (D.D.C. 1997).  In presenting allegations of government misconduct, however, the requester must put forth "compelling evidence" that the government agency has engaged in illegal activity and that the information sought is necessary to confirm or refute that evidence.  Computer Prof'ls for Soc. Responsibility v. United States Secret Serv., 72 F.3d 897, 904-05 (D.C. Cir. 1996).

In Lurie, 970 F. Supp. at 39, allegations of scientific misconduct, improper associations with non-governmental organizations, and misrepresentation of results concerning AIDS tests conducted by the Department of the Army indicated a strong public interest in the procedures used in conducting those tests, and that this interest was not "one of mere curiosity regarding internal matters of no public consequence."  Here, AHAS makes two allegations of misconduct.  First, AHAS alleges that the study's

methodology is suspect because different reports based on the
same data indicated different percentages of "drowsy" drivers.
FHWA responds that the reports used different methods of
segmenting the data and that such statistical questions cannot be
determined from release of the videos.  AHAS's evidence on this
point is not compelling.

AHAS also submits evidence that determining whether a
particular driver appears "drowsy" is an inherently subjective
task, subject to potential bias and inconsistencies, and that
FHWA did not take appropriate measures to ensure objectivity in
its results.  FHWA argues that the methods by which those who
observed the videotapes were trained has been disclosed and that
there is no reason to believe their observations were inaccurate.
While the allegations of misrepresentation here are by no means
as serious as were those in Lurie, AHAS raises a legitimate
question as to the manner in which relevant data were extracted
from the videos.  The public has an interest in the accuracy of
this method.

In sum, there is a public interest in releasing the
videotapes.  The public has interests in examining the
information upon which government rules are based, in seeing how
and why public funds are spent, and in examining the methods by
which the government produces data, especially when there are
questions about the validity or reliability of that methodology.

## II.  PRIVACY INTEREST

This case presents the novel question of whether a FOIA
Exemption 6 privacy interest exists in the unidentified
videotaped image of an individual's face.  Privacy encompasses
the ability of the individual to control information concerning
his or her person.  <u>Reporters Comm.</u>, 489 U.S. at 763.  Exemption
6 is designed to protect personal information, even if it is not
embarrassing or of an intimate nature.  <u>National Ass'n of Retired
Fed. Employees v. Horner</u>, 879 F.2d 873, 875 (D.C. Cir. 1989).
Information such as place of birth, date of birth, date of
marriage and comparable data is exempt from a disclosure that
would constitute a clearly unwarranted invasion of personal
privacy.  <u>Id.</u>  However, the release of such information
constitutes only a *de minimis* invasion of privacy when the
identity of the individual is unknown.  <u>United States Dep't of
State v. Ray</u>, 502 U.S. 164, 176 (1991).

The D.C. Circuit has observed that the information recorded
through the capture of a person's voice is distinct and
cumulative to the information contained in the words themselves.
<u>New York Times Co. v. Nat'l Aeronautics and Space Admin.</u>, 920
F.2d 1002, 1006 (D.C. Cir. 1990).  In making this observation,
the court contrasted silently reading a Verdi opera with hearing
the opera performed.  <u>Id.</u>  Similarly, the coding associated with
the videotaped images of drivers' faces cannot convey all of the

information contained in the videos.  FHWA extracted from the
videos its own determination whether a driver was awake, asleep
or in a stage of drowsiness while driving.  However, no driver,
within or without this study, is drowsy in exactly the same way.
The videos may contain indicia of alertness that FHWA did not
deem relevant.  In addition, the videos may reveal facial
expressions and cues bearing on other mental and physical states
while driving.  These sorts of personal details, captured up
close and over a prolonged period of time, are not generally
available in the ordinary course of daily life.  To that extent,
the drivers have a privacy interest in their videotaped images
from the study.

In general, disclosing a videotaped image would be a *de
minimis* invasion of privacy if the subject's identity were
unknown or not readily ascertainable.  However, the severity of
the potential invasion also turns upon the unique facts of a
case.  FHWA argues that the invasion of privacy occasioned by
release of the videotapes would be severe because (1) the drivers
were promised confidentiality; (2) public shame could result to
those drivers who appear to be drowsy at the wheel; (3) the
drivers could be subject to further harassment; and (4) releasing
such data would chill the availability of drivers for future
studies.  AHAS responds that (1) promises of confidentiality do
not automatically trump disclosure; (2) there is no public shame

in appearing drowsy at the wheel; (3) there is no serious threat of future harassment to any driver; and (4) any chill on future studies is of no weight in determining whether to release important public information.

The invasion of privacy resulting from releasing the videotapes would be more than *de minimis*.  However, it is not obvious that, as a matter of law, this invasion would be so significant as to outweigh the legitimate public interest in disclosure.  The drivers' privacy interest is bolstered by the privacy guarantee contained in the form each driver signed. Assurances of confidentiality are to be accorded some weight in assessing privacy interests under FOIA Exemption 6, but such promises do not necessarily prohibit disclosure.  Ray, 502 U.S. at 177.  In this case, each driver was promised that his "name will not be used" and that the results of the study would be identified only "by code number to maintain your privacy."  The promise in this case that the driver's "name will not be used" is not highly relevant, because both parties agree that the names of the drivers are not directly identifiable from the videotapes. However, the promise that the results of the study will be identified "by code number to maintain your privacy" presents a closer question.

Under a narrow view, the purpose of this phrase was to prevent any person from determining which items of data in the

study correspond to any particular driver.  Releasing the
videotapes along with corresponding code numbers could violate
the privacy pledge under this view, but mere release of the
videotapes, with all code number information redacted, might not.
This latter method of release would not reveal which drivers were
considered awake or drowsy for purposes of the study.  Under a
broad view, the purpose of this phrase was to prevent any person
from viewing the videotapes other than those persons necessary to
extract the relevant information and record it in a coded,
anonymous manner.  Releasing the videotapes could directly
violate the privacy pledge under this view by subjecting the
drivers' images to public view.

     The privacy protected by the form lies between the two
extremes.  The form states that a coded number will be used to
protect the privacy of each driver.  Because the coded numbers
are used to disassociate study data from particular drivers, such
a dissociation appears to have been the primary purpose of the
privacy guarantee.  However, because the vague phrase "your
privacy" might well be interpreted by a lay study subject to
cover disclosure of his videotaped image in any manner, the
form's promise of privacy enhances the privacy interest of the
drivers.  The evidence does not show that this interest is so
overwhelming as to settle the matter in FHWA's favor as a matter
of law.

In addition, a driver's privacy interest is enhanced only by
a minimal degree based on the possibility that he may appear
drowsy at the wheel.  The record reflects that while no crashes
or accidents occurred during the study, some drivers appeared
drowsy at the wheel.  The record does not reflect that any
conduct recorded on the videotapes could provide the basis for
civil liability or professional penalties.  Further, even the
"mere threat of media attention does not suffice to draw the
protective cloak of Exemption 6 over information that happens to
be newsworthy."  Washington Post Co., 943 F. Supp. at 36.

FHWA alleges that drivers who are shown to be drowsy or
drifting at the wheel might face difficulty in obtaining future
employment.  While this point is intuitively convincing, it does
not deserve great weight in this analysis.  FHWA has not
presented any evidence that the drivers' current or future
employment would be at risk.  Consequently, the only remaining
risk to the drivers is that they may experience shame or
embarrassment from appearing sleepy at the wheel.  This risk is
minimal for three reasons: (1) these data were collected in 1993,
and while present embarrassment might certainly result from
disclosure of past drowsiness, the great passage of time could
serve to dissipate the risk of such shame; (2) fatigue by CMV
drivers is a common occurrence, as the purpose of the study
indicates; and (3) the released videotapes would not be

accompanied by coded data that showed when the government
considered the driver to be drowsy, and therefore any judgment as
to the driver's condition would be a subjective evaluation made
by the viewer.  Accordingly, the risk of embarrassment only
slightly enhances the drivers' privacy interests.

Moreover, there is no evidence of a serious threat of
harassment to any participant driver.  The threat that disclosure
would pose to individual privacy interests must be real, not
speculative.  <u>Carter v. United States Dep't of Commerce</u>, 830
F.2d 388, 391 (D.C. Cir. 1987); <u>Rose</u>, 425 U.S. at 380 n.19
("Exemption 6 [is] directed at threats to privacy more palpable
than mere possibilities.").

The degree to which disclosure will cause an interference
with personal privacy is determined by the likelihood that the
effect will ever come to pass, not by the number of links in the
causal chain.  <u>Horner</u>, 879 F.2d at 878.  Therefore, assuming that
a driver's videotaped image ultimately could be identified as
that of a particular individual, "the risk of unwanted contact
following a FOIA disclosure is a privacy interest that must be
weighed in the privacy interest/public interest balance."  <u>ACLU
v. United States Dep't of Justice</u>, Nos. 10-5159, 10-5167, 2011 WL
3890837, at *7 (D.C. Cir. Sep. 6, 2011).  In <u>Horner</u>, 879 F.2d at
878, the evidence showed that retired or disabled federal
employees faced the very real possibility of a "barrage of

solicitations" from various marketers.  Based on the evidence
presented in Ray, 502 U.S. at 176-77, the Court found that
Haitian immigrants faced the very real possibility of political
reprisals from the Haitian government for illegally leaving their
homeland.  Here, FHWA has alleged future harassment to the
subject drivers without presenting evidence of the nature or
likelihood of any reprisals.  Such vague concerns are merely
speculative, do not rise to the level of concern indicated by Ray
or Horner, and, consequently, do not enhance the drivers' privacy
interests.

Finally, FHWA has failed to provide evidence that releasing
the videotapes will chill future studies.  The belief that
disclosure might impair the government's ability to acquire
similar information in the future carries no weight under FOIA
Exemption 6, which focuses on individual privacy interests.
Washington Post Co., 690 F.2d at 259.  The chill on future
studies may be relevant in considering the applicability of other
FOIA exemptions which focus on governmental privileges, but FHWA
has not argued that any other exemption applies in this case.

In sum, the drivers' privacy interests in the videotapes are
more than de minimis and sufficient to withstand summary judgment
for AHAS, but insufficient to warrant summary judgment for FHWA.
These interests are decidedly enhanced by the promise of
confidentiality made to the subject drivers and somewhat enhanced

by the risk of public shame at appearing drowsy at the wheel.
There is no evidence that these interests are enhanced by
speculative claims of future harassment or by the chill on future
government studies.

<u>CONCLUSION</u>

Both parties' motions for summary judgment will be denied.
FHWA's decision to withhold, under FOIA Exemption 6, the
videotapes requested by AHAS, is assessed by weighing the public
interest in disclosure against the subject drivers' privacy
interests in non-disclosure.  A public interest exists in
releasing the requested videotapes because it will reveal
information about (1) FHWA's rulemaking process; (2) FHWA's
expenditure of public funds; and (3) FHWA's methodology, where
legitimate questions exist as to its validity and reliability.
The subject drivers have a privacy interest in non-disclosure,
because (1) releasing the videotapes may violate confidentiality
promised to the drivers upon their participation in the study;
and (2) subject drivers shown to be drowsy could be subject to
potential shame and difficulty in obtaining future employment.
The drivers' privacy interest is not enhanced by merely
speculative risks of future harassment or legally irrelevant
concerns about the chill to future studies.  However, the
drivers' privacy interests neither clearly outweigh nor are
clearly outweighed by, the public's interests in releasing the

- 20 -

videotapes.  Thus, neither motion for summary judgment is
supported by sufficient facts in the record so far to entitle the
movant to judgment as a matter of law, and both motions will be
denied without prejudice to refiling them with specific
additional evidence reflecting the weight of the public interest,
particularly the present relevance of the study's methodology,
and the weight of the privacy interest, particularly the scope of
the confidentiality promised and the likelihood of threats of
harassment or liability to the drivers who took part in the
study.

SIGNED this 13th day of October, 2011.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge