UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ADVOCATES FOR HIGHWAY AND AUTO SAFETY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 98-306 (RWR) |
| FEDERAL HIGHWAY ADMINISTRATION, DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Plaintiff Advocates for Highway and Auto Safety ("AHAS"), a public interest, safety research, and lobbying organization, challenges the decision of defendant Federal Highway Administration ("FHWA"), a modal administration of the United States Department of Transportation ("DOT"), to withhold access to videotapes requested under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The parties have filed cross-motions for summary judgment. Because the factual record is insufficient to find that either side is entitled to judgment as a matter of law, both motions will be denied.

### BACKGROUND

In 1989, FHWA initiated "The Commercial Motor Vehicle Driver Fatigue and Alertness Study" ("the study") to observe and measure the development of fatigue by Commercial Motor Vehicle ("CMV")

drivers under authentic road conditions. (Def.'s Mem. of P. & A. Supp. Mot. Summ. J. ("Def.'s Mem.") at 2.) The purposes of the study were to research CMV driver fatigue and to inform a review of FHWA's regulations on hours of service for CMV drivers. (Def.'s Mem. at 2; Def.'s Reply Mem. Supp. Summ. J. ("Def.'s Reply") at 3.)

As a part of the study, video cameras were mounted in the trucks of certain qualified CMV drivers. (Def.'s Mot. Summ. J. ("Def.'s Mot."), Decl. of Paul L. Brennan ("Brennan Decl.") ¶ 5.) These cameras simultaneously recorded the driver's face and the road extending out before him, with the results captured on videotape in a split-screen format. (Id.) The study collected over 4,000 hours of such "driver face" information. (Id. ¶ 8.) Several of the videotapes revealed drowsy drivers, some of whom appeared to be drifting off the road. (Id. ¶ 14.) However, no accidents occurred during the study. (Id.)

The subjects of the study were eighty male CMV drivers employed by three motor carriers. (Id. ¶ 3.) Every subject signed a form which read:

> Each driver's results will be used only for
> the scientific goals of this research. Your
> name will not be used. Your results will be
> identified in the data base [sic] by a code
> number to maintain your privacy.

(Id.) The tapes contain no information personally identifying the drivers other than the images of their faces. (Id. ¶ 8.) It

is impossible, for purposes of AHAS's FOIA request, to redact the identifying features of the subject drivers because the informational value of the videotapes lies in the appearance of these features. (Id. ¶ 14.)

The study ran from 1989 to 1996. (Pl.'s Mot. Summ. J. ("Pl.'s Mot."), Pl.'s Statement of Facts ("Pl.'s Facts") ¶ 1; Def.'s Opp. to Pl.'s Mot. Summ. J., Def.'s Resp. to Pl.'s Statement of Facts ("Def.'s Resp. Facts") ¶ 1.) The Essex Corporation of Goleta, California collected the videotape data in 1993 under a contract with FHWA. (Id.) The study cost an estimated $4.5 million. (Pl.'s Mem. of P. & A. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 5; Def.'s Mem. at 2.)

AHAS filed a FOIA request for access to 199 hours of driver face videotapes. (Pl.'s Facts ¶ 10; Def.'s Mot., Def.'s Statement of Facts ("Def.'s Facts") ¶ 1.) FHWA denied the request, citing FOIA Exemption 6 and stating that release of the information would constitute an invasion of the privacy of the drivers who participated in the study. (Pl.'s Facts ¶ 10; Def.'s Facts ¶ 2.) AHAS appealed FHWA's decision through the appropriate DOT administrative procedures.[1] (Def.'s Facts ¶ 3).

---

[1] AHAS filed a second FOIA request, this time seeking access to the entire database collected for the study. (Pl.'s Facts ¶ 10; Def.'s Facts ¶ 4.) FHWA responded by making copies of all

FHWA denied AHAS's administrative appeal.  (Def.'s Facts ¶ 7.)
AHAS filed this action, and both sides have moved for summary
judgment.

## DISCUSSION

Summary judgment is appropriate where the record shows that
"there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A party seeking summary judgment must provide the
district court with a factual record sufficient to demonstrate
the absence of a genuine issue of material fact.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The moving party
may support its motion successfully if it "'inform[s] the
district court of the basis for its motion, and identif[ies]
those portions of the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, which it believes demonstrate the absence of
a genuine issue of material fact.'"  Frito-Lay, Inc. v.
Willoughby, 863 F.2d 1029, 1032 (D.C. Cir. 1988) (citing Celotex,

---

requested records available to AHAS other than those which relate to the driver face videos.  (Pl.'s Facts ¶ 12; Def.'s Facts ¶¶ 5-6.)

AHAS originally asserted that this second request was at issue in this case.  Both parties now agree that there is no dispute regarding any non-videotape material.  (Pl.'s Reply to Def.'s Mem. P. & A. Opp'n Pl.'s Mot. Summ. J. and in Further Supp. Pl.'s Mot. Summ. J. at 8.)  Accordingly, this opinion is limited to the 199 hours of videotape which constitute AHAS's initial request.

477 U.S. at 323). In this case involving cross-motions for summary judgment, the inquiry is whether either party, as a movant, has provided sufficient evidence that no factual dispute exists concerning the application of FOIA Exemption 6 to the videotapes requested by AHAS.

FOIA facilitates open access to federal government documents by members of the public. Dep't of Air Force v. Rose, 425 U.S. 352, 360-61 (1976); see also U.S. Dep't of Defense v. Fed. Labor Relations Bd., 510 U.S. 487, 494 (1994). It is "basic policy that disclosure, not secrecy, is the dominant objective" of FOIA. Rose, 425 U.S. at 361. Full disclosure serves crucial twin objectives: to ensure an informed public and to subject government activity to "the critical lens of public scrutiny." Alliance for the Wild Rockies v. Dep't of the Interior, 53 F. Supp. 2d 32, 35 (D.D.C. 1999); Southern Utah Wilderness Alliance, Inc. v. Hodel, 680 F. Supp. 37, 39 (D.D.C. 1998).

Congress recognized, however, that not all government information should be made available for disclosure under FOIA. Alliance for the Wild Rockies, 53 F. Supp. 2d at 35. Specifically, FOIA Exemption 6 permits a government agency, such as FHWA, to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The primary purpose of Exemption 6 is "to protect individuals

from the injury and embarrassment that can result from the unnecessary disclosure of personal information." United States Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982). Because FOIA's central purpose is to ensure public scrutiny of government activities, and not information about private citizens that "happens to be in the warehouse of the Government," the government need not honor a request for information about a particular private citizen. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 774-75 (1989).

Both parties agree that the videos at issue are "similar files" within the meaning of Exemption 6. Consequently, the issue is whether release of the videos would "constitute a clearly unwarranted invasion of personal privacy." Such a determination is made by "weigh[ing] the privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999) (citation omitted).

I.  PUBLIC INTEREST

"The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency's performance of its

statutory duties or otherwise let citizens know what their government is up to." Lepelletier, 164 F.3d at 46 (citing United States Dep't of Defense v. FLRA, 510 U.S. 487, 497 (1994)) (internal quotations omitted).  AHAS argues that a strong public interest exists in the release of the videotapes because (1) the videos will serve as the basis for government regulations; (2) the cost and size of the study warrant public oversight; and (3) independent review of the study's results indicates problems with the study's methodology.  FHWA argues that a minimal public interest exists in release because (1) the videos contain information about the conduct of the drivers, and not of FHWA; (2) any benefit to the public is purely speculative; and (3) any existing questions about methodology would not be served by releasing the videos.

AHAS's public interest analysis remains viable despite the passage of some time since the conclusion of the study and the initiation of the instant action.  The study retains importance in the field and has informed successive DOT rulemakings on hours of service of drivers. See Final Rule, Hours of Service of Drivers, 73 Fed. Reg. 69567-02, 69575 (November 19, 2008) (stating "the Driver Fatigue and Alertness Study (DFAS) (Wylie et al., 1996) was the first to identify the impact of circadian rhythm on CMV driver alertness, and almost every fatigue study after the DFAS has used those results or found similar results,

to the point that the impact of circadian rhythm on driver performance is now a generally accepted principle"). DFAS was "a landmark study of driver fatigue" and "was particularly important in changing the methodology by which commercial driver research would be conducted in the future, introducing the use of instrumented vehicles and technology for collecting data in a field setting." Id.; see also Notice of proposed rulemaking, 75 Fed. Reg. 82170-01, 82173 (December 29, 2010) (reviewing history of CMV hours of service regulations and noting study's completion as part of turn to new "science-based" rules).

Releasing the videotapes will reveal information about the conduct of FHWA, a government agency. When an agency relies on information in formulating a rule, there is a strong public interest in disclosing the underlying information, even if it relates to particular individuals. Alliance for the Wild Rockies, 53 F. Supp. 2d at 37. In Alliance for the Wild Rockies, members of the public submitted comments to the Fish and Wildlife Service ("FWS") which served, in part, as the basis for FWS's rules relating to the conservation and survival of endangered grizzly bears. Id. at 32-36. Full disclosure of the comments, including the names and addresses of the contributors, was warranted because FWS relied upon them in formulating its regulations. Id. at 37. In this case, FHWA admitted that it would rely upon the videotapes in promulgating rules on driver

hours of service, though only to a limited degree. FHWA likened the videotapes to a single tree in the forest of information upon which the final rules would be based. (Def.'s Reply at 3.) However, since the videos ostensibly played a role in forming the rules, the public has an interest in observing every leaf of every tree in the forest of data upon which a public agency has relied in issuing rules that bind the public's conduct. Releasing the videos will cast light on FHWA's rulemaking process.

Moreover, releasing the videotapes will reveal information as to government expenditures on a project of substantial scale and expense. When information sheds light on the inner workings of a government agency, there is a public interest in its release. Washington Post Co. v. United States Dep't of Agric., 943 F. Supp. 31, 36 (D.D.C. 1996). Records that pertain to particular individuals may still be "cloaked with the public interest" and subject to disclosure if the information would shed light on agency action. The Nation Magazine, Washington Bureau v. United States Customs Serv., 71 F.3d 885, 894-95 (D.C. Cir. 1995). In Washington Post Co. v. Dep't of Agric., 943 F. Supp. at 36, the release of the names and addresses of individuals receiving cotton price support payments was warranted by the great public interest in overseeing the workings of the Department of Agriculture and its subsidy programs. Here, the

videos were gathered as part of a study which spanned seven years and cost $4.5 million. The public has an interest in seeing how and why taxpayers' money was spent. Such an interest is not merely speculative.

Finally, some controversy arose as to the methodology FHWA used in processing the data contained on the driver videotapes. Allegations of distortion and misrepresentation of data by government agencies heighten the public's interest in release of that data. Lurie v. Dep't of the Army, 970 F. Supp. 19, 39 (D.D.C. 1997). In presenting allegations of government misconduct, however, the requester must put forth "compelling evidence" that the government agency has engaged in illegal activity and that the information sought is necessary to confirm or refute that evidence. Computer Prof'ls for Soc. Responsibility v. United States Secret Serv., 72 F.3d 897, 904-05 (D.C. Cir. 1996).

In Lurie, 970 F. Supp. at 39, allegations of scientific misconduct, improper associations with non-governmental organizations, and misrepresentation of results concerning AIDS tests conducted by the Department of the Army indicated a strong public interest in the procedures used in conducting those tests, and that this interest was not "one of mere curiosity regarding internal matters of no public consequence." Here, AHAS makes two allegations of misconduct. First, AHAS alleges that the study's

methodology is suspect because different reports based on the same data indicated different percentages of "drowsy" drivers. FHWA responds that the reports used different methods of segmenting the data and that such statistical questions cannot be determined from release of the videos. AHAS's evidence on this point is not compelling.

AHAS also submits evidence that determining whether a particular driver appears "drowsy" is an inherently subjective task, subject to potential bias and inconsistencies, and that FHWA did not take appropriate measures to ensure objectivity in its results. FHWA argues that the methods by which those who observed the videotapes were trained has been disclosed and that there is no reason to believe their observations were inaccurate. While the allegations of misrepresentation here are by no means as serious as were those in Lurie, AHAS raises a legitimate question as to the manner in which relevant data were extracted from the videos. The public has an interest in the accuracy of this method.

In sum, there is a public interest in releasing the videotapes. The public has interests in examining the information upon which government rules are based, in seeing how and why public funds are spent, and in examining the methods by which the government produces data, especially when there are questions about the validity or reliability of that methodology.

II.  PRIVACY INTEREST

This case presents the novel question of whether a FOIA Exemption 6 privacy interest exists in the unidentified videotaped image of an individual's face.  Privacy encompasses the ability of the individual to control information concerning his or her person.  <u>Reporters Comm.</u>, 489 U.S. at 763.  Exemption 6 is designed to protect personal information, even if it is not embarrassing or of an intimate nature.  <u>National Ass'n of Retired Fed. Employees v. Horner</u>, 879 F.2d 873, 875 (D.C. Cir. 1989).  Information such as place of birth, date of birth, date of marriage and comparable data is exempt from a disclosure that would constitute a clearly unwarranted invasion of personal privacy.  <u>Id.</u>  However, the release of such information constitutes only a *de minimis* invasion of privacy when the identity of the individual is unknown.  <u>United States Dep't of State v. Ray</u>, 502 U.S. 164, 176 (1991).

The D.C. Circuit has observed that the information recorded through the capture of a person's voice is distinct and cumulative to the information contained in the words themselves. <u>New York Times Co. v. Nat'l Aeronautics and Space Admin.</u>, 920 F.2d 1002, 1006 (D.C. Cir. 1990).  In making this observation, the court contrasted silently reading a Verdi opera with hearing the opera performed.  <u>Id.</u>  Similarly, the coding associated with the videotaped images of drivers' faces cannot convey all of the

information contained in the videos. FHWA extracted from the videos its own determination whether a driver was awake, asleep or in a stage of drowsiness while driving. However, no driver, within or without this study, is drowsy in exactly the same way. The videos may contain indicia of alertness that FHWA did not deem relevant. In addition, the videos may reveal facial expressions and cues bearing on other mental and physical states while driving. These sorts of personal details, captured up close and over a prolonged period of time, are not generally available in the ordinary course of daily life. To that extent, the drivers have a privacy interest in their videotaped images from the study.

In general, disclosing a videotaped image would be a *de minimis* invasion of privacy if the subject's identity were unknown or not readily ascertainable. However, the severity of the potential invasion also turns upon the unique facts of a case. FHWA argues that the invasion of privacy occasioned by release of the videotapes would be severe because (1) the drivers were promised confidentiality; (2) public shame could result to those drivers who appear to be drowsy at the wheel; (3) the drivers could be subject to further harassment; and (4) releasing such data would chill the availability of drivers for future studies. AHAS responds that (1) promises of confidentiality do not automatically trump disclosure; (2) there is no public shame

in appearing drowsy at the wheel; (3) there is no serious threat of future harassment to any driver; and (4) any chill on future studies is of no weight in determining whether to release important public information.

The invasion of privacy resulting from releasing the videotapes would be more than *de minimis*. However, it is not obvious that, as a matter of law, this invasion would be so significant as to outweigh the legitimate public interest in disclosure. The drivers' privacy interest is bolstered by the privacy guarantee contained in the form each driver signed. Assurances of confidentiality are to be accorded some weight in assessing privacy interests under FOIA Exemption 6, but such promises do not necessarily prohibit disclosure. Ray, 502 U.S. at 177. In this case, each driver was promised that his "name will not be used" and that the results of the study would be identified only "by code number to maintain your privacy." The promise in this case that the driver's "name will not be used" is not highly relevant, because both parties agree that the names of the drivers are not directly identifiable from the videotapes. However, the promise that the results of the study will be identified "by code number to maintain your privacy" presents a closer question.

Under a narrow view, the purpose of this phrase was to prevent any person from determining which items of data in the

study correspond to any particular driver.  Releasing the videotapes along with corresponding code numbers could violate the privacy pledge under this view, but mere release of the videotapes, with all code number information redacted, might not.  This latter method of release would not reveal which drivers were considered awake or drowsy for purposes of the study.  Under a broad view, the purpose of this phrase was to prevent any person from viewing the videotapes other than those persons necessary to extract the relevant information and record it in a coded, anonymous manner.  Releasing the videotapes could directly violate the privacy pledge under this view by subjecting the drivers' images to public view.

The privacy protected by the form lies between the two extremes.  The form states that a coded number will be used to protect the privacy of each driver.  Because the coded numbers are used to disassociate study data from particular drivers, such a dissociation appears to have been the primary purpose of the privacy guarantee.  However, because the vague phrase "your privacy" might well be interpreted by a lay study subject to cover disclosure of his videotaped image in any manner, the form's promise of privacy enhances the privacy interest of the drivers.  The evidence does not show that this interest is so overwhelming as to settle the matter in FHWA's favor as a matter of law.

In addition, a driver's privacy interest is enhanced only by a minimal degree based on the possibility that he may appear drowsy at the wheel. The record reflects that while no crashes or accidents occurred during the study, some drivers appeared drowsy at the wheel. The record does not reflect that any conduct recorded on the videotapes could provide the basis for civil liability or professional penalties. Further, even the "mere threat of media attention does not suffice to draw the protective cloak of Exemption 6 over information that happens to be newsworthy." Washington Post Co., 943 F. Supp. at 36.

FHWA alleges that drivers who are shown to be drowsy or drifting at the wheel might face difficulty in obtaining future employment. While this point is intuitively convincing, it does not deserve great weight in this analysis. FHWA has not presented any evidence that the drivers' current or future employment would be at risk. Consequently, the only remaining risk to the drivers is that they may experience shame or embarrassment from appearing sleepy at the wheel. This risk is minimal for three reasons: (1) these data were collected in 1993, and while present embarrassment might certainly result from disclosure of past drowsiness, the great passage of time could serve to dissipate the risk of such shame; (2) fatigue by CMV drivers is a common occurrence, as the purpose of the study indicates; and (3) the released videotapes would not be

accompanied by coded data that showed when the government considered the driver to be drowsy, and therefore any judgment as to the driver's condition would be a subjective evaluation made by the viewer. Accordingly, the risk of embarrassment only slightly enhances the drivers' privacy interests.

Moreover, there is no evidence of a serious threat of harassment to any participant driver. The threat that disclosure would pose to individual privacy interests must be real, not speculative. Carter v. United States Dep't of Commerce, 830 F.2d 388, 391 (D.C. Cir. 1987); Rose, 425 U.S. at 380 n.19 ("Exemption 6 [is] directed at threats to privacy more palpable than mere possibilities.").

The degree to which disclosure will cause an interference with personal privacy is determined by the likelihood that the effect will ever come to pass, not by the number of links in the causal chain. Horner, 879 F.2d at 878. Therefore, assuming that a driver's videotaped image ultimately could be identified as that of a particular individual, "the risk of unwanted contact following a FOIA disclosure is a privacy interest that must be weighed in the privacy interest/public interest balance." ACLU v. United States Dep't of Justice, Nos. 10-5159, 10-5167, 2011 WL 3890837, at *7 (D.C. Cir. Sep. 6, 2011). In Horner, 879 F.2d at 878, the evidence showed that retired or disabled federal employees faced the very real possibility of a "barrage of

solicitations" from various marketers.  Based on the evidence presented in Ray, 502 U.S. at 176-77, the Court found that Haitian immigrants faced the very real possibility of political reprisals from the Haitian government for illegally leaving their homeland.  Here, FHWA has alleged future harassment to the subject drivers without presenting evidence of the nature or likelihood of any reprisals.  Such vague concerns are merely speculative, do not rise to the level of concern indicated by Ray or Horner, and, consequently, do not enhance the drivers' privacy interests.

Finally, FHWA has failed to provide evidence that releasing the videotapes will chill future studies.  The belief that disclosure might impair the government's ability to acquire similar information in the future carries no weight under FOIA Exemption 6, which focuses on individual privacy interests.  Washington Post Co., 690 F.2d at 259.  The chill on future studies may be relevant in considering the applicability of other FOIA exemptions which focus on governmental privileges, but FHWA has not argued that any other exemption applies in this case.

In sum, the drivers' privacy interests in the videotapes are more than *de minimis* and sufficient to withstand summary judgment for AHAS, but insufficient to warrant summary judgment for FHWA.  These interests are decidedly enhanced by the promise of confidentiality made to the subject drivers and somewhat enhanced

by the risk of public shame at appearing drowsy at the wheel. There is no evidence that these interests are enhanced by speculative claims of future harassment or by the chill on future government studies.

CONCLUSION

Both parties' motions for summary judgment will be denied. FHWA's decision to withhold, under FOIA Exemption 6, the videotapes requested by AHAS, is assessed by weighing the public interest in disclosure against the subject drivers' privacy interests in non-disclosure. A public interest exists in releasing the requested videotapes because it will reveal information about (1) FHWA's rulemaking process; (2) FHWA's expenditure of public funds; and (3) FHWA's methodology, where legitimate questions exist as to its validity and reliability. The subject drivers have a privacy interest in non-disclosure, because (1) releasing the videotapes may violate confidentiality promised to the drivers upon their participation in the study; and (2) subject drivers shown to be drowsy could be subject to potential shame and difficulty in obtaining future employment. The drivers' privacy interest is not enhanced by merely speculative risks of future harassment or legally irrelevant concerns about the chill to future studies. However, the drivers' privacy interests neither clearly outweigh nor are clearly outweighed by, the public's interests in releasing the

videotapes. Thus, neither motion for summary judgment is supported by sufficient facts in the record so far to entitle the movant to judgment as a matter of law, and both motions will be denied without prejudice to refiling them with specific additional evidence reflecting the weight of the public interest, particularly the present relevance of the study's methodology, and the weight of the privacy interest, particularly the scope of the confidentiality promised and the likelihood of threats of harassment or liability to the drivers who took part in the study.

SIGNED this 13th day of October, 2011.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge